IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02747-MEH

GAS PRODUCTS CORPORATION,

      Plaintiff/Counter Defendant,

v.

BTU MARKETING, LLC, and
MONTIGO DEL RAY CORPORATION,

      Defendants/Counter Plaintiffs.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Defendants, BTU Marketing LLC and Montigo Del Ray Corporation, seek summary judgment on all three of Plaintiff, Gas Products Corporation's ("GPC") remaining claims. GPC's claims arise out of Defendants' alleged scheme to obtain the contact information of GPC's customers and sell products directly to them. The Court finds that disputed issues of fact remain on each of GPC's causes of action.

Additionally, Montigo seeks summary judgment on its counterclaim for breach of contract, which arises out of GPC's failure to pay for goods Montigo delivered to GPC. Because GPC does not dispute Montigo's evidence supporting the counterclaim, the Court enters judgment in favor of Montigo on this claim.

Accordingly, the Court grants in part and denies in part Defendants' Motion for Summary Judgment.

# BACKGROUND

## I.  Factual Background

The evidence submitted by the parties reveals the following facts viewed in the light most favorable to GPC, who is the non-moving party in this matter.

1.  Defendant Montigo Del Ray Corporation ("Montigo") is a fireplace manufacturer started by Dan Binzer in approximately 1984.  Dep. of Dan Binzer, June 29, 2017, 10:20–11:5, ECF No. 42-1.

2.  Montigo produces off-the-shelf and custom-designed fireplaces.  *Id.* at 33:14–34:7.  The custom-designed products are called "C-View fireplaces."  Mot. for Summ. J. 3; Dep. of Ray Scott, March 17, 2017 ("Scott dep."), 40:17–:18, ECF No. 42-2.

3.  Montigo uses manufacturer's representatives to sell its fireplaces.  Mot. for Summ. J. 3; Scott dep. 37:1–40:18.

4.  The duties of manufacturer's representatives include finding purchasers of Montigo's products and ordering the fireplaces for customers in a given geographic region.  Mot. for Summ. J. 3; Scott dep. 37:9–:16.

5.  Montigo paid its manufacturer's representatives a five percent commission on all sales within a given representative's region.   Mot. for Summ. J. 3; Scott dep. 180:17–:19.

6.  After Ray Scott formed Plaintiff GPC in the 1980s, GPC became a manufacturer's representative for many companies selling a variety of gas-related products.   Mot. for Summ. J. 3–4; Scott dep. 8:6–9:25.

7.  GPC generally employed between one and two individuals other than Mr. Scott.  Scott dep. 237:25–41:12, ECF No. 45-2.

8.     One of these individuals, T.J. Hines, worked for GPC as an independent contractor. *Id.* at 239:9–:19. Mr. Hines assisted with GPC's general sales. *Id.* at 19:16–20:7.

9.     In 1999 or 2000 GPC became Montigo's manufacturer's representative for Colorado, Wyoming, Montana, and Utah. Mot. for Summ. J. 4; Scott dep. 34:1–36:5.

10.    For non-custom fireplaces, Montigo would generally ship the product to the customer and then collect payment from GPC. Scott dep. 53:12–15, ECF No. 42-2.

11.    As such, GPC had a credit line with Montigo that changed throughout the parties' business relationship. *Id.* at 54:13–:21.

12.    When GPC ordered a C-View fireplace for a customer, it filled out a Montigo form with the customer's shipping and contact information. Scott dep. 40:10–42:9; ECF No. 45-2. At the time of the order, GPC paid Montigo a deposit. Scott dep. 53:23–54:10. Montigo collected the remainder of the balance before shipping the custom fireplace. *Id.*

13.    GPC asserts the parties agreed that if GPC submitted a C-View order form, Montigo would not sell directly to that customer. *Id.* at 169:18–:24.

14.    According to GPC, in approximately 2001, it began warehousing Montigo's products. Scott dep. 45:6–46:1, ECF No. 45-2. This allowed GPC to deliver the product directly to distributors, retailers, and home builders. *Id.* Additionally, it permitted GPC to install the product for customers located near its warehouse. *Id.* at 46:6–:17.

15.    When GPC began warehousing Montigo's fireplaces, it agreed that it would no longer sell any other manufacturer's products. Scott dep. 18:21–:25.

16.    GPC maintained a list of all the customers to which it sold products. Scott dep. 140:9–:19. The list included the customer's name, ID, telephone number, and type of

product purchased.  *Id.* at 141:2–42:10.

17.     The list included customers that purchased products from GPC both before and after GPC began doing business with Montigo.  *Id.* at 31:22–32:5.

18.     In approximately 2009, GPC began to struggle financially.  Mot. for Summ. J. 5; Scott dep. 56:21–:25, ECF No. 42-2.  As a result, GPC maintained past due balances with Montigo, which reached up to $110,000.00.  Mot. for Summ. J. 5; Scott dep. 57:1–:8.

19.     According to GPC, it agreed to pay an extra ten percent on every order it had with Montigo to reduce its past due balance.  Scott dep. 67:22–:25.

20.     In June 2012, Montigo formally terminated GPC as its manufacturer's representative.  Mot. for Summ. J. 5; Scott dep. 180:3–7; ECF No. 42-9.  However, GPC continued selling Montigo's products as a general distributor and customer.  Scott dep. 171:1–:12; ECF No. 42-9.

21.     Defendant BTU Marketing, LLC ("BTU"), which is owned by Dave Fredericks, replaced GPC as Montigo's manufacturer's representative.  ECF No. 42-9; Scott dep. 181:1–:25; Dep. of Dave Fredericks, June 27, 2017 ("Fredericks dep."), 22:18–:19, ECF No. 42-3.

22.     On September 20, 2012, Mr. Scott sent an email to Scott Baron, a Montigo employee, to voice his concern about BTU selling C-View fireplaces in the Colorado market.  ECF No. 42-11.

23.     Also in September 2012, Mr. Fredericks met with Mr. Scott to discuss the relationship between GPC and BTU.  Fredericks dep. 113:7–:25; Scott dep. 209:3–:18.  According to GPC, Mr. Fredericks told Mr. Scott that BTU would not "go after [GPC's] customers, period."  Scott dep. 209:17–:18.

24.     GPC claims it subsequently began noticing it was losing customers. Scott dep. 211:5–:7.

25.     According to GPC, Mr. Scott contacted Mr. Fredericks in 2015 regarding GPC's decline in sales. Scott dep. 211:5–:20. Mr. Fredericks told Mr. Scott that Montigo was giving GPC's customer information to BTU and telling BTU to "go get them." *Id.* at 216:14–:19.

26.     GPC stopped purchasing products from Montigo in May 2015. ECF No. 42-20, at 79. After making a payment to Montigo on May 18, 2015, GPC had a remaining accounts payable balance of $9,583.39. *Id.*

27.     On March 17, 2016, Montigo sent GPC a letter attempting to collect GPC's outstanding balance. ECF No. 15.

## II.     Procedural History

GPC filed its Complaint in state court on August 25, 2016. Compl., ECF No. 2. On November 9, 2016, Defendants removed the case to this Court. Notice of Removal, ECF No. 1. On December 15, 2016, this Court granted GPC's unopposed motion to amend its complaint. ECF No. 23.

GPC asserts four causes of action in its Amended Complaint: (1) misappropriation of trade secrets, (2) civil conspiracy, (3) interference with existing contractual relationships, and (4) interference with prospective contractual relationships. Am. Compl. ¶¶ 26–50, ECF No. 24. All of GPC's claims arise out of GPC's allegations that Defendants obtained its customers' contact information from order forms it submitted to Montigo and then used that information to sell directly to the customers. *Id.* ¶¶ 18–21.

Defendants responded to the Amended Complaint by filing a Motion to Dismiss. ECF No.

30.  On February 7, 2017, this Court granted in part and denied in part Defendants' motion.  Order on Mot. to Dismiss, ECF No. 36.  The Court held that GPC stated claims for misappropriation, conspiracy, and interference with prospective contractual relationships.  *Id.*  However, because GPC did not allege the existence of a specific contract that it had with a third party, the Court dismissed GPC's third claim for relief.  *Id.* at 9–10.

On February 21, 2017, Defendants filed their answer and counterclaims.  ECF No. 37.  Montigo asserted counterclaims against GPC for breach of contract and, in the alternative, unjust enrichment.  Answer & Countercls. 10–11.

After the parties completed discovery, Defendants filed the present Motion for Summary Judgment, which asks the Court to enter judgment in favor of Montigo on all of GPC's claims and on Montigo's breach of contract counterclaim.  ECF No. 42.  Defendants first argue that GPC's claims are time barred.  *Id.* at 8–11, 15–16, 20.  Then, Defendants contend GPC does not present evidence supporting a finding that the customer list is a trade secret or that Defendants misappropriated GPC's customer information.  *Id.* at 11–15.  Regarding GPC's tortious interference claim, Defendants contend there is no evidence of improper interference, and regardless, the information GPC asserts Defendants told to its customers was true.  *Id.* at 17–19.  Because GPC's conspiracy claim is derivative of the first two claims, Defendants argue that summary judgment is also proper on this cause of action.  *Id.* at 20.  Finally, Montigo contends the Court should enter judgment on its counterclaim, because the undisputed evidence demonstrates GPC failed to pay for goods that Montigo delivered.  *Id.* at 20–21.

GPC responded to Defendants' motion on August 28, 2017.  Resp. to Mot. for Summ. J., ECF No. 45.  To support its arguments, GPC primarily relies on the deposition testimony of Mr.

Scott, its founder and owner.  *Id.*  Defendants filed a reply brief on September 11, 2017.  ECF No. 47.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).  Only admissible evidence may be considered when ruling on a motion for summary judgment.  *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined.  *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial.  Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact."); *Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Defendants' motion asks the Court to determine whether disputed issues of material fact exist as to all three of GPC's remaining claims. Additionally, the Court must analyze whether the evidence demonstrates a dispute regarding Montigo's breach of contract counterclaim.

### I.     Misappropriation of Trade Secrets

GPC claims Defendants misappropriated its trade secret when Montigo used the C-View order forms to obtain GPC's customer information and then told BTU to contact those customers. Am. Compl. ¶¶ 26–33, ECF No. 24. Defendants assert GPC's claim is barred by the three-year statute of limitations, because the undisputed evidence indicates GPC knew of the underlying conduct in 2012. Mot. for Summ. J. 8–11. Next, Defendants contend GPC fails to present evidence that GPC owned the customer list. *Id.* at 13–14. Additionally, Defendants assert the customer list is not a trade secret, and regardless, there is no evidence that Defendants misappropriated the customer list. *Id.* at 11–15.

The Court first finds that GPC demonstrates a disputed issue of material fact regarding Defendants' statute of limitations defense. The Court then holds that, viewing the evidence in a light most favorable to GPC, a reasonable jury could find Defendants misappropriated GPC's trade secret.

A.    Statute of Limitations

A claim for misappropriation of trade secrets is subject to a three-year statute of limitations. Colo. Rev. Stat. § 7-74-107 (2017). "[T]he statute of limitations on trade secret misappropriation claims begins to run not when a plaintiff can positively and directly prove misappropriation rather than independent development, but simply when the plaintiff has knowledge of sufficient facts from which a reasonable jury could infer misappropriation." *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1218 (10th Cir. 2000) (interpreting Section 7-74-107); *Gognat v. Ellsworth*, 224 P.3d 1039, 1046–47 (Colo. App. 2009) (agreeing with *Chasteen's* construction of Section 7-74-107). Because GPC filed this action on August 25, 2016, Compl., ECF No. 2, its claim is time barred if it had knowledge of facts giving rise to the misappropriation claim before August 25, 2013.

"In the civil context, whether a claim is barred by the expiration of an applicable statute of limitations is a question of fact. *Gognat*, 224 P.3d at 1045. However, "if the undisputed facts clearly show when a plaintiff discovered or should have discovered the damage or conduct, the issue may be decided as a matter of law." *Murry v. GuideOne Specialty Mut. Ins. Co.*, 194 P.3d 489, 491 (Colo. App. 2008).

Here, GPC demonstrates a disputed issue of fact regarding when it discovered the facts giving rise to its misappropriation of trade secrets claim. According to Mr. Scott, he first learned that Defendants were approaching GPC's customers after GPC's sales dropped "in late 2015." Scott dep. 211:5–:20, 242:1–:23. Defendants argue that portions of Mr. Scott's testimony demonstrate he had knowledge of the misappropriation in 2012. Mot. for Summ. J. 9–10. Specifically,

Defendants cite to Mr. Scott's statement that the discussion between him and Mr. Fredericks regarding Montigo's disclosure of customer information "had to be" later in 2012. *Id.* at 10; Scott dep. 211:2–:3. The Court does not find Mr. Scott's testimony so clear. First, Mr. Scott's statement that "it had to be" was in response to defense counsel's question regarding whether the meeting took place later in 2012. Scott dep. 211:2–:3. Immediately before answering this question Mr. Scott made clear to defense counsel that he does not know "exactly when [the meeting] happened." *Id.* at 210:22–11:1. Second, Mr. Scott immediately corrected his testimony by stating that the meeting happened once Mr. Scott realized GPC was losing customers in 2015. *Id.* at 211:5–:20. Moreover, when defense counsel later asked Mr. Scott whether the meeting at issue occurred in the fall of 2012, Mr. Scott responded that it happened "later than that probably. . . . Probably closer to 2015ish, mid-2015. *Id.* at 216:9–:19. Viewing this testimony in a light most favorable to GPC, it at least creates a disputed issue of fact as to whether the meeting when Mr. Scott obtained his knowledge of the misappropriation happened before August 2013.

The Court also does not find that a September 20, 2012 email from Mr. Scott to a Montigo employee conclusively establishes Defendants' statute of limitations defense. In this email, Mr. Scott stated that Mr. Frederick "has indicated that he will sell a C-View direct in the Colorado market under BTU Marketing." ECF No. 42-11. When asked about the email, Mr. Scott testified he was concerned that Montigo was going to allow BTU "to come in and start going after [GPC's] customers." Scott dep. 185:6–:11. However, Mr. Scott's statements in the email and his testimony do not undisputedly show he knew Defendants were approaching GPC's customers at that time. Instead, they show only that Mr. Scott was concerned Defendants might do so in the future. Indeed, when discussing the email Mr. Scott specifically stated that Defendants were not already approaching GPC's customers. Scott dep. 188:15–:17. Because the misappropriation had not

occurred at the time of the email, GPC could not have had knowledge of the facts giving rise to the claim.

Therefore, the Court finds that Mr. Scott's testimony demonstrates disputed issues of material fact as to whether GPC learned about the misappropriation after August 25, 2013. As such, the Court must consider the merits of GPC's misappropriation of trade secrets claim.

B.      Disputed Issues of Facts Regarding the Merits

To state a claim for misappropriation of trade secrets under Colorado law, a plaintiff must show that it possessed a trade secret and that the defendant misappropriated that information. *See* Colo. Rev. Stat. § 7-74-102; *L-3 Commc'n Corp. v. Jaxon Eng'g & Maint., Inc.*, 125 F. Supp. 3d 1155, 1180 (D. Colo. 2015). Before discussing the evidence supporting the elements of the claim, the Court will address Defendants' argument that GPC does not own the trade secret.

1.      Ownership of the Customer List

When analyzing who owns a trade secret, courts should consider the parties' conduct and whether the parties had any written agreements over ownership. *See ICE Corp. v. Hamilton Sundstrand Corp.*, 432 F. App'x 732, 738 (10th Cir. 2011) (affirming the district court's conclusion "that a reasonable jury could determine ownership based on the parties' conduct and written agreements"). Ownership of a trade secret is generally an issue of fact for the jury. *Id.* (affirming the district court's conclusion that a genuine issue of material fact existed regarding ownership of a trade secret).

Here, viewing the evidence in a light most favorable to GPC, a reasonable jury could find that GPC owned the customer list. Mr. Scott's testimony indicates that some of the customers on the list did business with GPC before GPC sold Montigo's products. Indeed, Mr. Scott identified some of the customers as purchasers of gas products or HVAC equipment, which are goods that

GPC stopped selling when it became Montigo's manufacturer's representative. Scott. dep. 141:25–42:18. Furthermore, Mr. Scott testified that he found purchasers of Montigo's products by approaching customers that had bought a different brand of product from GPC. *Id.* at 31:22–32:5. Therefore, GPC's development of the customer information supports the conclusion that at least some of the companies on the list were GPC's customers. Regarding agreements between Montigo and GPC, Mr. Scott testified that if GPC submitted an order form "indicating that [the purchaser] was [its] customer," Montigo would not sell directly to that purchaser. *Id.* at 170:4–:8. This demonstrates that Montigo understood the customers listed in the order forms were GPC's.

Defendants argue that Montigo owns the trade secret, because Montigo hired GPC to create the list, and Montigo paid GPC commission for finding customers. Mot. for Summ. J. 13–14; Reply in Supp. of Mot. for Summ. J., ECF No. 47. Defendants are correct that an individual hired to design or develop a trade secret does not own it. *See Comput. Assocs. Int'l., Inc. v. Am. Fundware, Inc.*, 831 F. Supp. 1516, 1524 (D. Colo. 1993). However, GPC submitted evidence indicating that GPC was not hired to find customers; it was hired to sell Montigo products. Indeed, Mr. Scott testified that Montigo paid GPC a five percent commission on the amount of sales GPC made, not on the amount of customer GPC obtained. Scott dep. 34:9–:15 ("So we would go out and sell to somebody, and we would get, I think it was, a five percent commission paid to GPC on everything that we sold."). Taken in conjunction with Mr. Scott's testimony that many of the customers had done prior business with GPC, a disputed issue of material fact exists over which party owns the trade secret. Therefore, the Court must address the evidence supporting the elements of GPC's claim.

2.      Whether GPC's Customer List is a Trade Secret

Colorado law defines a trade secret as "the whole or any portion or phase of any scientific

or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value." Colo. Rev. Stat. § 7-74-102(4) (2017). In deciding whether a trade secret exists, Colorado courts consider the following six factors:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, such as the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Saturn Sys. Inc. v. Militare*, 252 P.3d 516, 521–22 (Colo. App. 2011). Additionally, the holder of the trade secret must take reasonable efforts to prevent disclosure. Colo. Rev. Stat. § 7-74-102(4). Reasonable efforts "include advising employees of the existence of a trade secret, limiting access to a trade secret on a 'need to know' basis, and controlling plant access." *Saturn Sys. Inc.*, 252 P.3d at 522. "What constitutes a trade secret is a question of fact for the trial court." *Id.* at 521; *Network Telecomms., Inc. v. Boor-Crepeau*, 790 P.2d 901, 902 (Colo. App. 1990).

Here, a disputed issue of fact exists as to whether GPC's customer list is a trade secret. In support of the first three factors, Mr. Scott testified that GPC used software to limit access to the list. Scott dep. 147:18–48:13, ECF No. 42-2. According to Mr. Scott, only he and Mr. Hines had full access to the customer list. *Id.* at 147:18–:22. To limit other employees' access to the list, GPC used the permissions mechanism on its sage software. *Id.* at 148:2–:7. That GPC used software to limit access to the customer information also supports a finding that it took reasonable efforts to prevent disclosure of the list.

GPC also submitted evidence supporting the fourth factor—the value to GPC in having the information. Mr. Scott testified that GPC lost significant business once Defendants began contacting

GPC's customers. Scott dep. 242:18–:20, ECF No. 45-2 (stating that GPC realized Defendants were contacting its customers in "late 2015, when [its] numbers were dropping dramatically"). Indeed, as a business whose profit derived only from selling Montigo fireplaces, GPC's customer list was highly valuable to it.

As for the fifth factor, Mr. Scott testified that he "had done the hard work to get those customers." Scott dep. 186:22–:25. This included developing a social media presence, attending trade shows, and meeting with builders and architects regularly. *Id.* at 23:9–:16, ECF No. 42-2. While applying Colorado law, the Tenth Circuit has specifically stated that a customer list can be a trade secret "when it is the end result of a long process of culling the relevant information from lengthy and diverse sources, even if the original sources are publically available." *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1114 (10th Cir. 2009). Because there is evidence indicating that Mr. Scott spent significant time compiling the list, the fifth factor does not undisputedly favor Defendants.

Lastly, evidence exists from which a jury could find that the sixth factor favors treating the list as a trade secret. That Mr. Scott spent significant time developing the list supports the notion that others would spent substantial time acquiring the information. Defendants contend the sixth factor does not favor classifying the list as a trade secret, because BTU acquired the customer information within only months. Reply in Supp. of Mot. for Summ. J. 6. However, according to GPC, BTU obtained the customer information within months, because Montigo improperly stole it from GPC's customer order forms.

To be sure, Defendants have produced much evidence supporting their argument that the customer list is not a trade secret. For example, Defendants point to testimony indicating that GPC did not designate the list as secret or advise Montigo of its confidential nature. Mot. for Summ. J. 12. Additionally, Defendants contend Montigo referred seventy percent of the customers to GPC.

*Id.* at 13. However, given the evidence GPC has submitted supporting a contrary holding, the Court cannot hold that the customer list is not a trade secret as a matter of law.

Precedent from the Tenth Circuit and this District supports the Court's holding. In *Hertz*, the Tenth Circuit held that the district court erred in holding as a matter of law that the plaintiff's customer list was not a trade secret. 576 F.3d at 1115. According to the court, although "[t]he general information about each company in the customer list may be publically available," there was no evidence that "a readily available public source would contain the identities of [the plaintiff's] actual and prospective customers." *Id.* at 1114. Furthermore, the court found it important that the plaintiff claimed it "spent anywhere from weeks to years developing th[e] customer relationships." *Id.* at 1114. Similarly, although an internet search could reveal potential purchasers of Montigo's products, it would not contain a condensed list of companies that bought products from GPC. Furthermore, Mr. Scott's testimony demonstrates he spent significant time developing the customer relationships. Scott dep. 186:22–:25. As such, "[w]hether [GPC's] customer list was easily ascertainable from public sources and whether [GPC] took reasonable means to guard against the secrecy of the list . . . [are] questions for a jury." *Hertz*, 576 F.3d at 1114.

The factual differences between this case and *Frontrange Solutions USA, Inc. v. Newroad Software, Inc.*, 505 F. Supp. 2d 821 (D. Colo. 2007) also support the Court's finding. In *Frontrange Solutions USA, Inc.*, the court held as a matter of law that the plaintiff's customer list was not a trade secret, because the plaintiff advertised the identities of its customers on its website and permitted free sharing of the information at its user group meetings. *Id.* at 837. Here, the undisputed evidence does not indicate that GPC freely shared its customers' names and contact information on its website or at group meetings. Although GPC provided the information to Montigo on order forms, it did so only to permit Montigo to ship goods to its customers. Scott dep. 40:10–42:9; ECF No. 45-2.

Based on this precedent and the testimony before the Court, a reasonable jury could find that GPC's customer list is a trade secret. Accordingly, the Court must analyze whether disputed issues of fact exist regarding Defendants' misappropriation of GPC's customer list.

3.  Whether Defendants Misappropriated GPC's Customer List

A party demonstrates misappropriation by proving:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
(I) Used improper means to acquire knowledge of the trade secret; or
(II) At the time of disclosure or use, knew or had reason to know that such person's knowledge of the trade secret was:
(A) Derived from or through a person who had utilized improper means to acquire it;
(B) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
(C) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
(III) Before a material change of such person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Colo. Rev. Stat. § 7-74-102(2). Therefore, Colorado law defines misappropriation broadly "to include virtually any improper acquisition, disclosure, or use of a trade secret . . . ." *Gognat*, 259 P.3d at 501.

The Court holds that, although a close call, GPC has introduced sufficient evidence of misappropriation to overcome summary judgment. Defendants argue there is no evidence they disclosed or used the customer information they obtained from GPC. Mot. for Summ. J. 15; Reply in Supp. of Mot. for Summ. J. 5. Instead, Defendants contend they acquired the customer information through the door-to-door efforts of Mr. Fredericks and other BTU employees. Reply in Supp. of Mot. for Summ. J. 5. However, according to Mr. Scott, Mr. Fredericks stated that a

Montigo representative told him who the customers were and to "go get them."[1]  Scott dep. 211:11–:15.  Based on this statement, a reasonable jury could find that Defendants obtained GPC's customer information from the order forms and conveyed it to BTU.

Defendants then claim that even if they used the information GPC disclosed in the order forms, GPC's claim cannot succeed, because Montigo did not agree to keep this information confidential.  Mot. for Summ. J. 14–15; Reply in Supp. of Mot. for Summ. J. 4–5.  However, Mr. Scott testified that Montigo agreed not to sell to a company if GPC used the order form to indicate the purchaser was a GPC customer.  During Mr. Scott's deposition, defense counsel asked Mr. Scott, "So the agreement was Montigo wouldn't sell around you if you submitted a form for a custom fireplace?"  Scott dep. 170:4–:6.  Mr. Scott responded, "indicating that it was our customer, yes." *Id.* at 170:7–:8.  Although Defendants contend the parties agreed only that Montigo would not sell around GPC for the project related to that order form, a jury could reasonably interpret Mr. Scott's testimony as meaning that Montigo agreed not to sell to any GPC customers included in the order forms.  *See* Scott dep. 169:20–:23 ("They had no scruples with bypassing you as their distributor. So you had to identify yourself as that customer was your customer.").

Furthermore, an express agreement to maintain the confidentiality of the agreement is not necessary.  *See Mineral Deposits Ltd. v. Zigan*, 773 P.2d 606, 608 (Colo. App. 1988) ("If a trade

---

[1] These statements would generally constitute hearsay within hearsay, because they are out of court statements offered for their truth.  However, they qualify for exclusion from the hearsay rule as statements of party opponents pursuant to Fed. R. Evid. 801(d)(2). *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1208 (10th Cir. 2010) ("[W]ere both [declarants] party-opponents, the hearsay problem would evaporate because both links in the chain of communication would involve non-hearsay party opponent admissions."); *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1081–82 (6th Cir. 1999) (holding that a witness' testimony of a party's agent's statement to a second agent was admissible pursuant to Fed. R. Evid. 801(d)(2)(D)).

secret is divulged under an express *or implied* restriction of nondisclosure or nonuse, a party who engages in unauthorized use of the information will be liable in damages to the owner of the trade secret." (emphasis added)).  A reasonable jury could find that GPC's disclosure of its customer information to Montigo for shipping purposes created an implied duty to not use that information for a separate purpose.  Because GPC presents evidence that Defendants disclosed and used its trade secret notwithstanding that they acquired the information with a duty to maintain its secrecy, summary judgment is not proper on GPC's misappropriation of trade secrets claim.

## II.    Tortious Interference with Prospective Business Relationships

GPC's fourth cause of action asserts Defendants tortuously interfered with GPC's prospective contractual relationships.  Am. Compl. ¶¶ 46–50, ECF No. 24.  Defendants contend they are entitled to summary judgment, because the interference claim is barred by the applicable statute of limitations, and there are no disputed issues of fact on the merits.  Mot. for Summ. J. 15–19.  The Court first finds that Defendants are not entitled to summary judgment as a result of the two-year statute of limitations.  Then, the Court holds GPC has submitted sufficient evidence to overcome summary judgment on the merits.

### A.    Statute of Limitations

The statue of limitations does not presently bar GPC's claim.  Under Colorado law, claims for tortious interference with prospective business relationships are subject to a two-year statute of limitations.  Colo. Rev. Stat. 13-80-102(1)(a) (2017).  Here, GPC claims two wrongful acts underlying its claim—misappropriating its customer information and informing its customers of its poor credit with Montigo.  Am. Compl. ¶¶ 46–49, ECF No. 24.  Regarding misappropriation, the Court has already held that GPC has submitted evidence indicating it did not learn of this until 2015, which is well inside the two-year limitations period.  Mr. Scott also testified that he learned of

Defendants' statements about GPC's poor credit in 2015. Scott dep. 261:2–:3. As such, the Court holds that GPC has at least demonstrated a disputed issue of fact over whether its tortious interference claim is barred by the statute of limitations.

B.     Disputed Issues of Fact Regarding the Merits

To establish a claim for tortious interference with prospective contractual relationships, a plaintiff must demonstrate that the defendant's improper and intentional actions prevented the formation of a contract between the plaintiff and a third party. *Wasalco, Inc. v. El Paso County*, 689 P.2d 730, 732 (Colo. App. 1984); *Omedelena v. Denver Options, Inc.*, 60 P.3d 717, 721 (Colo. App. 2002). As stated above, GPC bases its claim on two separate acts of Defendants—the misappropriation of GPC's trade secrets and calling GPC's customers to inform them of its credit issues. GPC has demonstrated disputed issues of fact regarding its theory that Defendants interfered with its prospective customer relationships by misappropriating its trade secrets. However, GPC fails to submit admissible evidence in support of its theory that Defendants contacted its customers to discuss GPC's credit standing with Montigo.

1.     Wrongful Means by Misappropriation

Colorado courts have not specifically addressed whether misappropriating trade secrets constitutes an improper action underlying an interference with contractual relations claim. However, "[n]umerous [other] courts have [] recognized that a competitor's interference with another's prospective business relations through independently actionable conduct such as misappropriation of trade secrets or breach of a confidentiality agreement between the parties constitutes 'wrongful conduct' defeating the competitor's privilege." *Energex Enters., Inc. v. Anthony Doors, Inc.*, 250 F. Supp. 2d 1278, 1285–86 (D. Colo. 2003) (collecting cases). This Court believes the Colorado Supreme Court would follow the holdings of the many other courts that have considered the issue

and conclude that misappropriation of trade secrets constitutes wrongful means.

Additionally, GPC has presented evidence that Defendants' misappropriation of its customer information prevented the formation of a contract. Mr. Scott testified that many of the customers Defendants approached had purchased products from GPC on previous occasions. *See* Scott dep. 211, 242–46. "[A] continuing business or customary relationship, which includes a prospective quasi-contract suffices to create rights against intentional interference." *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1117 (D. Colo. 2004). Therefore, GPC has introduced sufficient evidence to overcome summary judgment on this theory of its tortious interference with prospective business relationships claim.

### 2. Wrongful Means by Contacting Customers

GPC fails to submit admissible evidence to support of its theory that Defendants improperly interfered with its customer relationships by calling its customers to discuss its poor credit. The only evidence supporting this theory is Mr. Scott's testimony that GPC's customers stated Defendants told them GPC had poor credit with Montigo. Scott dep. 259:11–:25, ECF No. 42-2. However, because these statements constitute inadmissible hearsay, GPC cannot rely on them to avoid summary judgment. Although Montigo's statements to GPC's customers are excluded from the hearsay rule as opposing party admissions, the customers' statements to Mr. Scott do not fall under an exclusion or exception to the rule. Because GPC presents no admissible evidence that Defendants spoke with its customers about its credit issues, Defendants are entitled to summary judgment on this theory.

In sum, the Court holds that the two-year statute of limitations does not presently bar GPC's tortious interference claim. Furthermore, GPC has demonstrated a disputed issue of material fact over whether Defendants' misappropriation of its customer list interfered with its prospective

contractual relationships. However, because GPC presents no evidence to support its theory that Defendants interfered with its future business relationships by disclosing credit issues to its prior customers, the Court grants summary judgment on this theory.

## III. Civil Conspiracy

The Court holds that GPC has submitted sufficient evidence to demonstrate a disputed issue of material fact regarding its conspiracy claim. To state a claim for civil conspiracy under Colorado law, a plaintiff must show: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) an unlawful overt act; and (5) damages as to the proximate result." *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995). Defendants' primary argument for summary judgment on this claim is that GPC cannot show an unlawful overt act.[2] Mot. for Summ. J. 20, ECF No. 42. However, the Court has already held that GPC has demonstrated disputed issues of material fact over whether Defendants misappropriated its trade secret and tortuously interfered with its prospective business relationships. If a jury were to find that Defendants committed either of these acts, GPC would establish the unlawful act element of its conspiracy claim. *See Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1116 (10th Cir. 2009) (holding that the plaintiff's "conspiracy claim . . . depends on the factual findings already discussed in its misappropriation of trade secret claims").

Defendants also assert GPC has not presented evidence of an agreement between Montigo

---

[2] Defendants also argue that "for the same reason the other two claims are time barred, so is the conspiracy claim." Mot. for Summ J. 20, ECF No. 42. However, because the Court held that the misappropriation and tortious interference claims are not presently barred by the statute of limitations, the civil conspiracy claim is also not presently time barred. *See Sterenbuch v. Goss*, 266 P.3d 428, 436 (Colo. App. 2011) ("[C]ivil conspiracy claims share a statute of limitations with the underlying tort." (quoting *Prince George's County v. Longtin*, 19 A.3d 859, 877 (Md. 2011))).

and GPC to maintain the confidentiality of the information. Mot. for Summ. J. 20. The Court disagrees. To prove an agreement underlying a civil conspiracy, a plaintiff need not demonstrate an express agreement; "[a] conspiracy may be implied by a course of conduct and other circumstantial evidence. . . . [T]here must be some indicia of agreement in an unlawful means or end." *Schneider v. Midtown Motor Co.*, 854 P.2d 1322, 1327 (Colo. App. 1992) (alterations in original) (quoting *Martinez v. Winner*, 548 F. Supp. 278 (D. Colo. 1982)). Mr. Scott testified that Montigo told BTU to approach GPC's customers, and BTU did so. Scott dep. 211:11–:20, ECF No. 45-2. The Court finds this sufficient to imply an agreement to misappropriate GPC's trade secrets. As such, summary judgment is not proper on GPC's civil conspiracy claim.

## IV. Montigo's Counterclaim for Breach of Contract

Lastly, Montigo seeks summary judgment on its counterclaim for breach of contract. Mot. for Summ. J. 20–21, ECF No. 42. Montigo claims the undisputed evidence demonstrates that GPC failed to pay for products it ordered totaling $9,583.00. *Id.* at 20. GPC contends that summary judgment is improper, because Montigo has not provided the details of the contract it alleges GPC breached. Resp. to Mot. for Summ. J. 19–20, ECF No. 45. Additionally, GPC argues that if a jury finds in its favor on its tort claims, it will be excused from performance under the contract. *Id.* at 20. The Court holds that Montigo is entitled to summary judgment on this claim.

To prove a breach of contract claim, a party must demonstrate: (1) the existence of a contract, (2) performance by the claimant or some justification for nonperformance, (3) failure to perform the contract by the opposing party, and (4) resulting damages. *See, e.g.*, *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1057 (Colo. 1992).

Montigo presents evidence of each of these elements. First, Montigo and GPC agreed that GPC would pay for non-custom goods it ordered after Montigo shipped them. Scott dep.

53:12–55:20 (explaining the agreement and credit limit GPC had with Montigo); *see* ECF No. 42-20, at 79 (invoices showing amounts GPC owed Montigo for purchased goods). Because GPC has not asserted a statute of frauds defense, either in its Answer, ECF No. 40, or in its Response to Defendants' Motion for Summary Judgment, ECF No. 45, Montigo is not required to produce a signed contract between the parties. *See Int'l Network, Inc. v. Woodard*, No. 15CA2132, 2017 WL 1279767, at *7 (Colo. App. 2017) (stating that a party can waive the statute of frauds defense). Regarding the second element, Montigo asserts that it performed its contractual obligations by shipping the goods GPC ordered. Decl. of Ron Urquhart ¶¶ 8–10, ECF No. 42-20. As for the third and fourth elements, GPC failed to pay Montigo for $9,583.39 of the products its ordered. *Id.* at ¶ 9; ECF No. 42-20, at 79 (invoice showing amount GPC owes Montigo); ECF No. 42-15 (letter to Mr. Scott from Montigo's accounts receivable department requesting payment in full of GPC's $9,583.39 outstanding balance). Therefore, GPC failed to perform its contract obligations, and Montigo suffered damages as a result.

Importantly, GPC does not present evidence disputing this. GPC cites only to Mr. Scott's testimony where he stated that, as far as he knows, GPC does not owe any money to Montigo. Resp. to Mot. for Summ. J. 20; Scott dep. 138:12–:15. This uncertain statement in a deposition is insufficient to create a disputed issue of fact over whether GPC owed Montigo money. This is especially true, because Mr. Scott also testified that he does not know "one way or the other" whether GPC paid its outstanding balance to Montigo. Scott dep. 137:19–:20.

GPC also argues that summary judgment is improper on the breach of contract claim, because if it prevails on its misappropriation and interference claims, its performance under the

contract will be excused.[3]  Resp. to Mot. for Summ. J. 20.  The Court disagrees.  GPC does not cite

(and the Court does not find) any support for the proposition that a party is excused from performing

under a contract when the other party to the agreement commits an unrelated tort.  To be sure, one

party's breach of a contract excuses the other party from performing his obligations under the same

contract.  *Kaiser v. Mkt. Square Disc. Liquors, Inc.*, 992 P.2d 636, 641 (Colo. 1999) ("[P]erformance

under a contract is excused only by a material breach by the other party . . . .").  However, it does

not follow that if one party commits a tort, it excuses the other party from performing obligations

under an unrelated contract between the parties.

The only case GPC cites does not support its argument.  In *Shotkoski v. Denver Inv. Grp.*,

the court recognized that the violation of a statute may in some circumstances render an agreement

unenforceable.  134 P.3d 513, 515–16 (Colo. App. 2006).  However, the court held that this is not

so when the contract is independent of the statutory violation.  *Id.*  Similarly, even if a tort could

excuse performance under a contract in some circumstances, it would not do so when the contractual

obligations are unrelated to the tort.  Because GPC's purchases from Montigo are independent of

the misappropriation of GPC's trade secrets, Montigo's liability in tort would not excuse GPC from

performing under the contract.

Therefore, the Court holds that summary judgment on Montigo's breach of contract claim

is proper.  As such, the Court enters judgment in favor of Montigo for $9,583.39.  However, because

disputed issues of fact remain on GPC's causes of action, the Court will exercise its discretion to

---

[3] In GPC's Answer to Montigo's counterclaim, it asserts an unclean hands defense. Answer ¶ 28, ECF No. 40.  However, GPC abandons this defense in its Response to Defendants' Motion for Summary Judgment.  Moreover, because "[t]he doctrine of unclean hands enables a defendant to . . . defeat equitable remedies, but not remedies at law," the defense would not apply to Montigo's breach of contract claim. *Wilson v. Prentiss*, 140 P.3d 288, 293 (Colo. App. 2006).

defer execution of the $9,583.39 judgment until after judgment is entered on GPC's affirmative claims.

## CONCLUSION

In sum, the Court holds that GPC's remaining three claims are not time barred. Additionally, disputed issues of material fact exist on each of the claims. However, because GPC does not provide admissible evidence supporting its theory that Defendants interfered with its prospective contractual relationships by disclosing GPC's credit issues to its customers, the Court grants summary judgment on this theory. Furthermore, the Court grants summary judgment for Montigo on its breach of contract claim, because GPC does not rebut Montigo's evidence establishing the counterclaim. The Clerk of the Court is directed to enter judgment in favor of Montigo in the sum of $9,583.39. The Court defers execution of this judgment until a final judgment is rendered on GPC's affirmative claims. Additionally, because Montigo pleaded its unjust enrichment claim in the alternative, the Court dismisses that claim as moot. Accordingly, Defendants' Motion for Summary Judgment as to All Claims in this Case [filed July 31, 2017; ECF No. 42] is **granted in part and denied in part.**

Entered and dated at Denver, Colorado, this 21st day of September, 2017.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge

25